IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


MELINDA JENSEN,                          05-CV-233-BR

         Plaintiff,                      OPINION AND ORDER

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

         Defendant.


DAVID B. LOWRY
9900 SW Greenburg Road
Columbia Business Center, Suite 235
Portland, Oregon 97223

         Attorney for Plaintiff

KARIN IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 S.W. Third Avenue
Portland, Oregon 97204-2902


1  -   OPINION AND ORDER

**MICHAEL McGAUGHRAN**
Office of the General Counsel
**L. JAMALA EDWARDS**
Special Assistant United States Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

**BROWN, Judge.**

  Plaintiff Melinda Jensen seeks judicial review of a final decision by the Commissioner of the Social Security Administration (SSA) denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).

  Following a thorough and careful review of the record, the Court **REVERSES** the Commissioner's final decision and **REMANDS** this matter for the calculation and award of benefits.


      <u>**ADMINISTRATIVE HISTORY**</u>

  Jensen filed her application for DIB on July 31, 2000.  The application was denied initially and on reconsideration. An Administrative Law Judge (ALJ) held a hearing on June 13, 2003. At the hearing, Jensen was represented by an attorney. Jensen testified at the hearing and a Vocational Expert (VE) was scheduled to testify, but at the hearing, he realized he had had

2  -   OPINION AND ORDER

contact with Plaintiff through vocational rehabilitation and recused himself.  During the hearing, Jensen amended her onset date to January 26, 2001.

At a subsequent hearing on September 4, 2003, Jensen again was represented by an attorney.  Jensen and Patricia C. Lesh, a VE, testified at this hearing.

The ALJ issued a decision on October 21, 2003 in which he found Jensen was not entitled to benefits because she retained the residual functional capacity (RFC) to perform her past relevant work as a general clerk.


## BACKGROUND

Jensen was born in 1955 and was 48 years old at the time of the hearing.  She received a GED and completed one quarter of college.  Her previous work included clerical/reception, dog feeding/cleaning/grooming, travel agent, postal carrier, file clerk, teller, general office clerk, and running her own business as an exotic bird breeder.  She last worked full time on January 25, 2001.

In 1989, Jensen was in a car accident, which she believes is the underlying cause of her current medical problems.

Because of degenerative disc problems, Jensen had cervical spinal surgery on January 26, 2001.  Although the surgery appeared to be successful at first, the pain recurred.  Jensen

3  -   OPINION AND ORDER

eventually was diagnosed with myfascial syndrome, fibromyalgia, and depression in addition to severe degenerative disc disease.

Jensen alleges disability based on degenerative disc disease, acid reflux, gallstones, thyroid disease, depression, and tendinitis. She asserts she cannot work because of severe pain, fatigue, muscle cramps, headaches, depression, and loss of concentration and memory.

In her application for DIB, she complains of inflamed and numb arms and general pain. According to Jensen, her body hurts all over and her head pounds. She states she is unable to perform everyday activities such as household chores and personal hygiene maintenance. Her husband does all of the shopping and cooking. She also states she has trouble shampooing her hair, has difficulty in holding on to objects such as the telephone, and does not have the energy for hobbies or recreation. She can help load the dishwasher and do the laundry only on a good day. She also complains she "used to be so on top of everything. Could function and work circles around others. Now I cannot remember directions well[,] which confuses me and makes it seem like I do not understand." Tr. 124.[1]

Jensen's initial alleged date of onset was June 30, 1998, but she later amended that date to January 26, 2001, because she

---

[1] Citations to the official transcript of record filed with the Commissioner's Answer on February 23, 2006, are referred to as "Tr."

4  -  OPINION AND ORDER

had returned to work in the interim.  The amended date of onset is the date she had cervical surgery.


## STANDARDS

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. §405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).   The court must review the record as a whole and weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." *Andrews,* 53 F.3d at 1039-40.


## DISABILITY ANALYSIS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. § 404.1520.  *See also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  Each step is potentially dispositive.  Step One is not at issue here because it is

undisputed that Jensen has not worked since the amended date of onset.  Jensen, however, disputes the ALJ's findings in Steps Two, Three, and Four.

At Step Two, the Commissioner considers the medical severity of the claimant's impairments.  The claimant is not disabled if the Commissioner concludes the claimant does not have any "severe medically determinable physical or mental impairment" or combination of impairments that meet the duration requirement in § 404.1509.  20 C.F.R. § 404.1520(a)(4)(ii).

At Step Three, the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41.  *See also* 20 C.F.R. § 404.1520(d). The criteria for these listed impairments, also called Listings, are set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's RFC.  The claimant's RFC is an assessment of the sustained, work-related activities the claimant can still perform on a regular and continuing basis despite her limitations.  20 C.F.R. § 404.1520(e).  *See also* Social Security Ruling (SSR) 96-8p.

At Step Four, the claimant is not disabled if the

6  -   OPINION AND ORDER

Commissioner determines the claimant retains the RFC to perform work she has done in the past.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).

## THE ALJ'S FINDINGS

The ALJ found Jensen has cervical degenerative disc disease at multiple levels, fibromyalgia/myofascial pain syndrome, and thyroid disease.  He also acknowledged Jensen had spinal fusion surgery in January 2001 at C5-7.  The ALJ noted Jensen has a history of depression "that is deemed nonsevere."  The ALJ found "[t]hese impairments are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix l, Subpart P, Regulation No. 4."  Tr. 22.

The ALJ assessed Jensen's RFC as follows:

> The claimant is able to lift ten pounds frequently and twenty pounds occasionally.  She has difficulty with repetitive motion or forceful use of the upper extremities including gripping.  She is limited to occasional reaching above shoulder level or on extension from the body.  She is limited to occasional bending over, squatting and kneeling. She needs the opportunity to change position with relative frequency.  She has moderate limitations affecting her ability to follow detailed instructions.

Tr. 25.  In addition, the ALJ noted "the aforementioned mental functional limitation is related to the claimant's reports of pain and fatigue, which are deemed partially credible.  However, it is not intended to imply that the claimant has any severe

7  -   OPINION AND ORDER

limitations related to depression or other mental impairment."
Tr. 25.

The ALJ determined Jensen retains the RFC to perform the requirements of her past relevant work as a general office clerk. He relied on testimony from an impartial VE, who opined Jensen's past work as a general office clerk is compatible with the RFC contained in the ALJ's hypothetical. The ALJ also specifically found Jensen's "testimony and other allegations are not fully credible." Tr. 25. In summary, the ALJ concluded Jensen is not disabled and, therefore, is not entitled to DIB under the Social Security Act.

## DISCUSSION

Jensen alleges the ALJ erred in his conclusions at Step Two (severity determination), Step Three (whether listing criteria are met), and Step Four (whether Jensen can perform past relevant work).

**I.   Step-Two Analysis:  Whether the ALJ erred by finding Jensen's depression is not "severe."[2]**

Jensen alleges the ALJ erred when he found she "has a

---

[2] Jensen originally alleged the ALJ erred by finding that Plaintiff's sleep apnea and symptoms of obesity are not "severe" (Plaintiff's Opening Brief at 8) although she discussed her depression.  In her Reply Brief, Jensen referred to the ALJ's alleged error in Step Two as relating to  depression. The Court, therefore, concludes Jensen's depression is the issue at Step Two.

8  -   OPINION AND ORDER

history of depression that is deemed nonsevere." Tr. 22, 25.

Step Two, the "severity step," is designed to increase the efficiency of the evaluation process by excluding at an early stage those claimants whose impairments are so slight that the remaining steps are highly unlikely to lead to a finding of disability. *Bowen v. Yuckert,* 482 U.S. 137, 153 (1987). At Step Two, the ALJ must consider the combined effect of all of the claimant's impairments without regard to whether each alone is sufficiently severe. 42 U.S.C. § 404.1523. *See also Smolen v. Chater,* 80 F.3d 1273, 1289-90 (9th Cir. 1996).

Here the ALJ concluded Jensen's combined impairments are severe within the meaning of the regulations and proceeded to Step Three. For purposes of Step Two analysis, therefore, any error by the ALJ in describing Jensen's depression as "nonsevere" was harmless.

## II. __Step-Three Analysis__

### A. __Whether the ALJ erred by rejecting Dr. Stone's finding that Jensen had a spinal disorder that satisfied Listing 1.04A.?__

At the time of the hearing, P. Michael Stone, M.D., had been Jensen's treating physician for over a year. Jensen alleges the ALJ erred by rejecting Dr. Stone's finding that Jensen had a spinal disorder that satisfied Listing 1.04A. The record, however, does not contain such a finding. The record includes what appears to be a partially completed checklist questionnaire

concerning the Listing of Impairments and a Residual Functional Capacity Form completed by Dr. Stone, but it does not include any finding by Dr. Stone that Jensen's condition meets the requirements of Listing 1.04A.

Accordingly, the Court concludes the ALJ did not err as to this issue.

**B.    Whether the ALJ erred when he determined Jensen's RFC.**

After concluding that Jensen's collective impairments are severe but do not meet or equal a listed impairment, the ALJ was required to determine Jensen's RFC before moving on to Step Four. *See* 20 C.F.R. § 404.1520(e).

The RFC is an assessment of "what an individual can still do despite his or her limitations." SSR 96-8p. The ALJ considers "only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of related symptoms." SSR 96-8p. When determining a claimant's RFC, the ALJ must consider all of the relevant evidence in the record such as medical reports; lay evidence; and "effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." SSR 96-8p.

Jensen argues the ALJ failed to assess her RFC accurately because he erroneously rejected Jensen's testimony; improperly

10 -    OPINION AND ORDER

discredited the RFC findings of Dr. Stone, Jensen's treating physician; rejected lay-witness statements; failed to consider Jensen's depression; and failed to do a full functional analysis of her capabilities.

    1. <u>Jensen's credibility</u>.

    The ALJ generally is responsible for resolving questions of credibility, but the ALJ's credibility findings must be supported by specific, cogent reasons. *Andrews v. Shalal*a, 53 F.3d at 1039. *See also Rashad v. Sullivan,* 903 F.2d 1229, 1231 (9th Cir. 1990). If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, the ALJ must give clear and convincing reasons for rejecting a claimant's testimony if there is not any evidence of malingering. *Smolen v. Chater,* 80 F.3d 1273, 1281-82 (9th Cir. 1996).

    Here the ALJ concluded "claimant's reports of pain and other subjective complaints are not found to be entirely credible." Tr. 24. In response to Jensen's attorney's statement in closing argument that there was no evidence of "malingering," the ALJ found Jensen "has not been entirely compliant with recommended medical treatment" based on her failure to follow through with physical therapy and failure to seek treatment for sleep disturbance and depression. Tr. 24. The ALJ further found Jensen "has shunned remedies that likely would enable her to

11 -    OPINION AND ORDER

increase her functioning" and "has become reliant on narcotic
pain medication and allowed herself to become deconditioned."
Tr. 24.  The ALJ opined, "[I]f medically compliant, [Jensen]
appears likely able to function to a greater extent than she
presents to her current treating physician and third parties.
Therefore, her testimony and other statements of record are not
found to be fully credible."  Tr. 24.

        The ALJ's reasons, however, are unconvincing.  The
record, in fact, contradicts the ALJ's conclusion that Jensen was
medically noncompliant.  She sought medical treatment for her
pain by undergoing cervical spinal surgery, epidural steroid
injections, intra-articular facet injections, medial branch
block, and radio frequency neurotomy.  She also participated in
physical therapy and tried traction and a TENS unit (electrical
stimulation).

        Although the ALJ stated Jensen "failed to follow
through with physical therapy after January 2001 surgery," the
medical records do not indicate that she refused prescribed
medical treatment.  In fact, the record suggests Jensen stopped
physical therapy because she believed it was not benefitting her.

        In addition, the ALJ's conclusion that Jensen could
function to a greater extent than she presents "if [she had been]
medically compliant" is speculative and not supported by
substantial evidence in the record.  Indeed, the record does not

12 -   OPINION AND ORDER

reflect Jensen could have returned to work even if she had engaged in certain courses of conduct.

Even though Jensen continued to have marked pain in her neck, the ALJ found Jensen lacked credibility based on statements by Mark Greenberg, M.D., one of her attending physicians at the Ashland Community Hospital. He stated on November 7, 2002 that Jensen's "pain does not follow any neurological or dermatomal distribution," and a neurological evaluation reflected normal "strength, intact reflexes and sensation with symmetry between right and left."  Tr. 23-24, 315. The ALJ also stated "[s]igns of possible exaggeration . . . were noted" (Tr. 23), but Dr. Greenberg's report does not contain any such notes.

In addition, the ALJ's rejection of Jensen's credibility based on Dr. Greenberg's neurological examination ignores the diagnosis of fibromyalgia. During a consultation on June 21, 2002, David I. Dryland, M.D., a rheumatologist, diagnosed Jensen as suffering from fibromyalgia with "18/18 1+ fibro tender points."  Tr. 275.  Indeed, during his June 24, 2002, examination, Dr. Greenberg himself reported Jensen was "tender in all American [*sic*] College of Rheumatology fibromyalgia trigger spots."  Tr. 323.  When discussing possible epidural steroid injections with Jensen, Dr. Greenburg specifically pointed out that "[b]ecause of the multi-modal

nature of her pain, we may only get partial relief."  Tr. 323.
When discussing possible radio frequency neurotomy, Dr. Greenberg
informed Jensen that this procedure has a "60-70% success rate."
Tr. 318.

        The ALJ appears to distrust the fibromyalgia diagnosis
because it is a condition "that cannot conclusively be confirmed
by any objective medical test."  Tr. 23.  The diagnosis, however,
is uncontroverted.  After a claimant produces medical evidence of
an underlying impairment, the ALJ "may not discredit the
claimant's testimony as to subjective symptoms merely because
they are unsupported by objective evidence." *Lester v. Chater,* 81
F.3d 821, 834 (9th Cir. 1995).

        SSR 96-7p provides one way to judge an individual's
credibility is a "longitudinal medical record demonstrating an
individual's attempts to seek medical treatment for pain or other
symptoms and to follow that treatment once it is prescribed."
Here Jensen consistently has reported her symptoms and
impairments over several years and, as described above, has tried
a vast array of treatments in an effort to control her pain.

        In June 2000, x-rays showed the degenerative change
at C5-6 had progressed "and has almost completely obliterated
the disc space."  Tr. 197.  An MRI showed foraminal narrowing at
C6-7.  James E. Dunn, II, M.D., Jensen's former treating
physician, noted these objective findings fit Jensen's symptoms,

14 -   OPINION AND ORDER

and he recommended Jensen go back to physical therapy for traction, etc.  Jensen appeared to experience some relief during that summer and reported feeling much better in September, at which time she also was working again.  By December, however, her symptoms of neck and arm pain returned.  Jensen testified she kept working despite the pain because it was a busy time of year.

In January 2001, Jensen had cervical spinal surgery, which appeared to be successful at first.  She testified "the disk above it[, however,] disintegrated" within 60 days after the surgery, the pain recurred, and she had to quit working. Tr. 270, 425.  She continued to complain of pain and other symptoms, even though there was no neurological explanation for the constellation of her symptoms.

In February 2002, Jensen's diagnosis was severe degenerative disc disease, myfascial syndrome, fibromyalgia, and depression.  Over the course of several months, she engaged in physical therapy and had an epidural steroid and other injections, a medial branch block, and a medial branch radio frequency neurotomy in an effort to control the pain.  In short, Jensen consistently reported her symptoms and impairments over a substantial period, which provides credibility to her complaints.

On this record, the Court finds the ALJ's credibility findings are unconvincing.  There is not any evidence that Jensen was medically noncompliant, and she has established she has a

medically determinable impairment that could reasonably be
expected to produce the symptoms reported by her. Accordingly,
the Court concludes the ALJ erred because he did not give clear
and convincing reasons for finding Jensen's testimony was not
credible.


        2.    Dr. Stone's RFC assessment.

        At the time of the hearing, Dr. Stone had been Jensen's
treating physician for over a year.  Jensen's counsel asked
Dr. Stone to complete a three-page Residual Functional Capacity
Form, which he did on May 24, 2003.  Citing to SSR 96-8p, the
directions on the form asked for an assessment of the patient's
ability to sustain full-time work on a regular and continued
basis, which was defined as eight hours a day for five days a
week in a competitive work environment.

        Dr. Stone indicated Jensen could sit for ten minutes
for a total of two hours, stand at one time for ten minutes for a
total of two hours, and walk at one time for ten minutes for a
total of one hour.  Dr. Stone also indicated Jensen must recline
for one hour three times a day.  He also found she occasionally
could lift up to ten pounds; occasionally carry up to five
pounds; and never climb stairs, bend, stoop, crouch, kneel, or
crawl.  Dr. Stone reported Jensen is incapable of hand activity
for more than one hour a day and cannot do repetitive work-

related activities such as grasping, pushing/pulling, and fine manipulations.  Her condition causes frequent moderately severe pain, frequent severe fatigue, severe inability to deal with stress, and frequent moderately severe cognitive problems.

Dr. Stone also reported Jensen's medications cause drowsiness, nausea, impaired concentration, and irritability, and her medical conditions cause frequent chronic headaches that interfere with her ability to maintain attention and concentration.  Dr. Stone opined Jensen's medication and medical conditions would cause her to miss work more than 75% of the time.

In addition to the RFC checklist, Dr. Stone prepared an undated cover memorandum in which he summarized several physical-examination records from January 24 through May 20, 2003.  In his memorandum, he stated he had been caring for Jensen for just over a year.  He initially saw her because Dr. Dunn had retired, and "she was not responding to surgical intervention of a cervical disc and resultant fusion while her myofascial pain syndrome increased."  Tr. 382.  Dr. Stone reported Jensen "had significant upper extremity and shoulder girdle dysfunction with limited range of motion of the cervical spine, shoulders, elbows and hands without generating pain. . . .  Her sleep patterns are poor due to her severe myofascial pain."  *Id*.  Although limited by the length of time he had known the patient, Dr. Stone reported "her

records are consistent with the mentioning of myofascial pain repeatedly, and consistently." *Id.* He stated Jensen's discomfort and severe fatigue preclude her from working full time, and "[i]t appears from her records that in retrospect this has been significantly true since 1998." *Id.*

When the treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing reasons." *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1996). Even if the treating physician's opinion is contradicted by another doctor, the ALJ may reject it only if he provides "specific and legitimate reasons supported by substantial evidence in the record." *Id.*

Here the ALJ accorded limited weight to Dr. Stone's RFC assessment and gave deference to the Disability Determination Services (DDS)[3] functional findings established by Martin Kehrli, M.D. and affirmed by Richard Alley, M.D. The ALJ found "Dr. Stone's functional findings appear to reflect what the claimant told him. He does not appear to have confirmed them by performing a formal physical capacity evaluation . . . [and they] do not appear to be well supported medically." Tr. 24. More specifically, the ALJ noted Jensen's "underlying orthopedic

_____

[3] Disability Determination Services (DDS) is a federally funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. § 405.101.

18 -    OPINION AND ORDER

impairment has been relatively minimal after her fusion surgery in early 2001," and "she appears to have remained orthopedically stable since her January 2001 fusion surgery."  Tr. 23.

The ALJ also found Jensen's apparent motor dysfunction reported by Dr. Stone is not confirmed by established diagnostic techniques such as formal neurological evaluations or nerve conduction studies.  The ALJ stated: "On the contrary, a neurological evaluation done by Dr. Greenberg on November 6, 2002, found normal 'strength, intact reflexes and sensation with symmetry between right and left.'"  Tr. 23, 315.

The Court, however, finds Dr. Greenberg's neurological findings and Jensen's orthopedic stability are insufficient grounds for discrediting Dr. Stone's findings and opinion. Although Dr. Stone's opinion included findings about Jensen's inability to use her hands for repetitive work-related activities and her ability to sit, stand, lift, carry, etc., he also opined her chronic headaches "frequently" interfere with her ability to maintain attention and concentration.  Tr. 396. He anticipated a 75% absentee rate if Jensen tried to work and that she would need frequent breaks from work.  Dr. Stone noted that Jensen's "severe" inability to deal with stress, "severe" fatigue, and medication side-effects would interfere with full-time work. Tr. 395-96.

Although the ALJ acknowledged Jensen's fibromyalgia

diagnosis, the ALJ noted the evaluation protocol used for
fibromyalgia is dependent primarily on the claimant's subjective
complaints of pain during examination, and "there is no
indication that a control point examination was done, nor other
precautions taken to confirm that the claimant's report of pain
were genuine." Tr. 23.  Even if Dr. Stone did not perform a
control-point examination during his exam, Dr. Dryland did so
during his rheumatologic consultation on June 21, 2002.  As
stated above, Dr. Dryland did a control-point examination and
concluded Jensen suffers from fibromyalgia with 18/18 trigger
points.  Moreover, as noted, Dr. Greenburg confirmed this
diagnosis during his examination of Jensen on June 24, 2002.  In
addition, the Court notes the ALJ's findings apply to the
diagnosis of Jensen rather than to her functional ability.

        The ALJ also found Dr. Stone's opinion that Jensen is
unable to do full-time work is contradicted by Dr. Dunn, Jensen's
previous treating physician, because the latter did not caution
Jensen to limit her activities.  It is true that Dr. Dunn
discussed fibromyalgia with Jensen on December 13, 2001, and told
her that "she must be physically active and engage in physical
activities, including stretching and strengthening, as well as to
engage in relaxation techniques, particularly for headaches."
Tr. 266.  Engaging in stretching and strengthening exercises and
relaxation techniques, however, is not the same as being able to

do full-time work.

The ALJ also stated, "The physician reported that Ms. Jensen was not entirely in agreement with this advice." Tr. 23. The ALJ, however, is incorrect. In the referenced medical entry, Dr. Dunn reported he discussed Jensen's fibromyalgia with her and how she might learn to cope with the pain. Contrary to the ALJ's summary of the entry, Dr. Dunn specifically reported Jensen was "totally concurrent with all of these concepts." Tr. 266.

The ALJ accorded little weight to Dr. Stone's functional assessment because the ALJ did not find Jensen's reports of pain and other subjective complaints to be credible. As noted, however, the Court found the ALJ erred when he rejected Jensen's testimony. Accordingly, the Court finds the ALJ erred when he rejected Dr. Stone's functional assessment on the ground that it is based in part on Jensen's reports of pain and other subjective complaints.

In addition, the DDS reviewing physicians provide the only contradiction in the record to Dr. Stone's opinion, and the only explanation the ALJ provided for his RFC findings is that he deferred to the DDS physicians' functional findings. Contrary to the instructions on the DDS form, however, the DDS physicians did not explain how and/or why the evidence supports the exertional limitations as set out. Moreover, the DDS's RFC evaluation is

21 -    OPINION AND ORDER

based on medical evidence in the file before Jensen's cervical surgery in January 2001 and her amended date of onset.  In other words, the DDS did not have the benefit of reviewing Jensen's extensive post-surgery medical records or have any information concerning her fibromyalgia.  DDS's RFC evaluation of Jensen, therefore, is woefully out of date, and the ALJ does not provide any other explanation for his RFC assessment.

The ALJ also stated the DDS functional findings are "consistent with the findings of Dr. Dunn."  Tr. 24.  However, the ALJ did not cite to any such findings of Dr. Dunn in the record.

Finally, the lay-witness affidavits discussed below support Dr. Stone's RFC findings concerning Jensen's extreme pain and fatigue.  Accordingly, the Court concludes the ALJ erred when he deferred to the DDS RFC evaluation and gave little weight to Dr. Stone's opinion without giving specific and legitimate reasons supported by the record for doing so.

3.    Lay-Witness Testimony.

Jensen also alleges the ALJ improperly rejected the lay witnesses' written statements.  The ALJ is required to consider observations by nonmedical sources as to the effect of an impairment on a claimant's ability to work.  20 C.F.R. § 404.1513(d)(4).  *See also* SSR 88-13.  In *Smolen v. Chater,* the court stated:  "[T]estimony from lay witnesses who see the

22 -   OPINION AND ORDER

claimant every day is of particular value, '[a]n eyewitness can often tell whether someone is suffering or merely malingering[, . . .] this is particularly true of witnesses who view the claimant on a daily basis . . .'; such lay witnesses will often be family members."  80 F.3d at 1289 (quoting *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993)). "[T]he ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects." *Smolen v. Chater*, 80 F.3d at 1288, *citing Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir. 1993).

    Jensen provided third-party statements by her daughter and a long-time friend describing her condition and its deterioration over time.  The ALJ summarily dismissed these affidavits because the individuals "can only speak to their observations and are not qualified to determine whether any apparent limitations are a result of medical necessity."  Tr. 24.

    In his Affidavit dated February 20, 2003, Daniel E. Swanson stated he has known Jensen and her husband for 23 years. His family and the Jensens spent much time together over the years at various events, holidays, and recreational activities. Swanson described Jensen as being energetic, talented, and extremely active.  According to Swanson, however, Jensen started to change after her 1989 automobile accident.  She moved more slowly, fatigued easily, and got behind in taking care of things.

In fall 1996, Swanson noticed Jensen was struggling to maintain her business, and she was "very unsteady on her feet and unable to stand or work for any period of time.  She also began to frequently complain of pain and weakness in her arms, hands, neck, and headaches."  Tr. 127.  Swanson noted Jensen would have to ask for assistance to hold a lightweight item such as a food dish for even a minute.

Swanson opined Jensen's condition had deteriorated dramatically since 1998.  He observed "she experiences almost constant severe pain and severe exhaustion.  On many occasions I have heard Melinda cry out in pain when trying to lift things or even trying to sit or stand."  Tr. 127.  He observed she is unable to take even 10 or 20 steps because of the pain and fatigue, and she frequently needs help getting in and out of a chair or bed.

Swanson noted Jensen seemed to get even worse after her surgery.  She tried to get back into the work force, but the pain forced her to quit.  Swanson stated Jensen's condition deteriorated even further over the past six to nine months and noted "on many occasions she is so weak and tired that she [is] unable to maintain her balance and often starts to stumble."  Tr. 128.  He also noted Jensen's memory and concentration have dramatically deteriorated, and she often forgets conversations that they had the day before.

24 -   OPINION AND ORDER

In her June 10, 2003, Affidavit, Kimberly Jensen,
Jensen's daughter, testified Jensen is unable to sit, to stand,
or to walk for more than 10-15 minutes because of her pain.
Because of Jensen's inability to sleep, she is exhausted every
day and needs to take a nap or lie down to rest for extended
periods.  Kimberly Jensen also testified the various medications

and therapies tried by Jensen have, at best, only brought her
short-term relief.

Kimberly Jensen noted her mother is unable to do basic
day-to-day activities such as sweeping or mopping floors, folding
laundry, or lifting more than five pounds without severe pain.
She has not been able to scrub the bathtub in many years, and
"she has tremendous problems doing normal daily activities such
as light cooking or driving."  Tr. 131.  Kimberly Jensen also
stated her mother tires after even the minimal typing required to
send a short email message and "talking on the phone with her
must be limited because it hurts her arms to hold the phone for
too long at one time."  Tr. 131.  Kimberly Jensen also noted her
mother suffers from feelings of worthlessness and guilt, and she
personally has witnessed her mother having crying spells.

The two lay witnesses provided lengthy descriptions of
their observations of Jensen and her functional limitations over
a considerable period.  The ALJ failed to "give reasons that are

25 -    OPINION AND ORDER

germane to each witness" for rejecting their testimony.  *Smolen*
80 F.3d at 1288.  For this reason, the Court finds the ALJ erred
when he rejected the lay-witness testimony.

    4.  <u>Consideration of Jensen's impairments</u>.

    At Step Three, if the ALJ finds one or more severe
impairments exist, all medically determinable impairments must be
considered in the remaining steps of the sequential analysis.
20 C.F.R. § 404.1523.  SSR 96-8p provides:

> In assessing RFC, the adjudicator must
> consider limitations and restrictions
> imposed by all of an individual's
> impairments, even those that are not
> "severe."  While a "not severe
> impairment(s) standing alone may not
> significantly limit an individual's ability
> to do basic work activities, it may--when
> considered with limitations or restrictions
> due to other impairments--be critical to
> the outcome of a claim.

Thus, even though the ALJ determined Jensen's depression alone is
not "severe," he still was required to consider it when assessing
her ability to function.  On the other hand, Jensen has the
burden of presenting evidence to support her alleged functional
limitations.  20 C.F.R. § 404.1512©).

    It is undisputed that Jensen has been diagnosed with,
suffers from, and has been treated for depression for many years.
The issue, however, at Step Three is whether any functional
limitations are caused by Jensen's depression, either alone or

26 -   OPINION AND ORDER

when combined with her other impairments.  Although Jensen's medical records are replete with references to her depression and her physicians prescribed medication for it, she has not provided evidence of any functional limitation caused by the depression. According to Jensen, even though her depression goes back for several years, the depression is due primarily to the change in her lifestyle and her inability to do the things that she used to do.

Because the Court is unable to find any evidence in the record that Jensen's depression, either alone or in combination with her other impairments, affects her capacity for work, the Court concludes the ALJ did not err as to this issue.

## III. **Step-Four Analysis**

### A. **Performance of past relevant work.**

The ALJ found Jensen could perform past relevant work as a general office clerk based on the VE's testimony and on the ALJ's findings that Jensen could perform a modified range of light work.  During the hearing, the ALJ reviewed Jensen's work history with the VE, including Jensen's testimony that she had worked as a general office clerk at Butler Ford.

The ALJ posed a hypothetical with some of the limitations contained in the DDS RFC report and added that Jensen has "moderate limitations affecting her ability to follow detailed

instructions."  Tr. 456-57.  In response to the ALJ's
hypothetical, the VE eliminated various past jobs, but he stated
"[t]he general clerk position could be performed" with the
limitations expressed in the hypothetical.  Tr. 457.

Jensen's counsel, however, asked the VE to review the RFC
form completed by Dr. Stone.  Based on the information provided
in that form, the VE agreed there would not be any work available
that Jensen could do.  Because the Court previously found
the ALJ erred when he gave little weight to Dr. Stone's opinion,
the Court finds the ALJ also erred by failing to consider
Dr. Stone's RFC evaluation when the ALJ made his RFC assessment,
posed an incomplete hypothetical to the VE, and concluded that
Jensen could perform her past relevant work as a general office
clerk.

**B.**   **Requirement to do a full functional analysis.**

Jensen also alleges the ALJ erred by failing to do a full
functional analysis of her capabilities and to compare them with
those required for her prior work.  *See* SSR 96-8p.  Because the
Court already concluded the ALJ's RFC assessment is not supported
by substantial evidence in the record, the Court need not reach
the issue.

**V.**  **Remand**

The decision whether to remand this case for further

proceedings or for the payment of benefits is a decision within the discretion of the Court. *Harman*, 211 F.3d 1178.  The decision generally turns on the likely utility of further proceedings. *Id.* at 1179.  The Court may "direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose." *Smolen v. Chater*, 80 F.3d at 1292.

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman*, 211 F.3d at 1178.  The Court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*  The second and third prongs of the test often merge into a single question:  Whether the ALJ would have to award benefits if the case were remanded for further proceedings.  *Id.* at 1178 n.2.

Here the ALJ failed to provide legally sufficient reasons for rejecting Dr. Stone's opinion, and, therefore, the Court must credit that opinion as a matter of law. *See Lester,* 81 F.3d at 834.  After crediting of Dr. Stone's opinion and considering the VE's testimony, the Court finds Jensen is unable to perform any

29 -   OPINION AND ORDER

kind of work.  Accordingly, the Court finds it is appropriate to remand this matter for the immediate calculation and award of benefits.


<u>**CONCLUSION**</u>

For these reasons, the Court **REVERSES** the Commissioner's decision denying disability benefits to Jensen and **REMANDS** this matter to the Commissioner pursuant to sentence four of U.S.C. § 405(g)for an immediate calculation and award of benefits.

IT IS SO ORDERED.

DATED this 22nd day of September, 2006.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge